791 So.2d 4 (2000)
GLOVEGOLD SHIPPING, LIMITED, Appellant,
v.
SVERIGES ANGFARTYGS ASSURANS FORENING d/b/a The Swedish Club, Appellee.
No. 1D99-1961.
District Court of Appeal of Florida, First District.
December 29, 2000.
Rehearing Denied August 14, 2001.
*6 Courtney Wilder Stanton and Thomas Corley Smith, of Law Offices of Courtney Wilder Stanton, Jacksonville. Stavros C. Haidemenos, London, and John Stratakis, New York, of Counsel, for Appellant.
George D. Gabel, Jr. and Timothy J. Conner, of Holland & Knight LLP, Jacksonville, for Appellee.
KAHN, J.
This case raises the question of whether a Florida court has jurisdiction over a foreign insurance company that denied coverage to one of its insureds, a foreign shipping company, when the insured vessel was extensively damaged while sailing in Florida waters. In particular, in this case, on February 5, 1996, a ship owned by appellant Glovegold Shipping, Limited (Glovegold) suffered catastrophic engine and other consequential damages off the Florida coast near Jacksonville. We conclude that the requirements of Florida's long-arm statute and the constitutional due process requirements for specific jurisdiction over appellee in Florida are met. We also conclude that the policy of marine insurance here at issue does not contain a valid forum selection provision. Accordingly, we reverse the order dismissing appellant's complaint for lack of jurisdiction and venue, and we remand this case for further proceedings.

I. FACTS

A. THE PARTIES
Appellee, the Swedish Club (TSC), an insurer headquartered in Sweden, provides insurance for vessels throughout the *7 world. TSC offers ship owners and operators three types of insurance to protect their interests in, and against potential liabilities on account of, their vessels: 1) protection and indemnity, such as against the risk of liability for a wide range of defined occurrences other than collision; 2) hull and machinery, such as first-party property damage and collision liability; 3) freight, defense and demurrage. TSC also promises to deliver those shipowners who insure with it a high level of insurance services, including response at the scene of any casualty, with TSC surveyors on hand to assist in the assessment of damage, and the preparation of specifications for repairs. TSC's internet site states that "[t]he Swedish Club's wealth of insurance, technical, and legal support is available on a round-the-clock basis, from the moment a member is involved in a casualty. Experienced specialists are dispatched to the scene."
As part of this worldwide insurance business, TSC has, as stated in its marketing materials on the internet site, established and maintained a worldwide "network of agents," including a system of correspondents throughout the United States, designed to respond in the event of a casualty anywhere in the world. This network includes technical, salvage, and legal correspondents in the three major Florida ports: Jacksonville, Tampa, and Miami. In the Miami area is the Coral Gables office of Scandinavian Marine Claims Office, Inc. (SMCO), which investigated the casualty in this case.
Appellant Glovegold, a Maltese company with offices in Pireaus, Greece, owned the ANTHENOR EXPRESS, a Maltese-flag cargo vessel. Denholm Shipmanagement LTD, a Scottish company, managed the vessel. According to evidence submitted by Glovegold, the vessel plied a regular and continuous trade in and out of Florida ports, including Jacksonville, Miami, Port Everglades, and Tampa. Her historic trading pattern can be summarized as follows:
Aug. 89-Dec. 90: MiamiCayman Islands
Jan. 91-Feb. 92: TampaGuatemala
Feb. 92-Jan. 94: MiamiBahamas
Jan. 94-Feb. 96: Jacksonville or Port EvergladesBahamas
During this time, various shipping organizations operating out of offices in Florida engaged the ANTHENOR EXPRESS on time-charters. During 1991 and 1992, the vessel was chartered to Tampa Bay Shipping of Florida. From 1993 through 1996, the vessel was chartered to Bahmar Agencies and SeaExpress, both managed from Miami. Danoff Inc., a Miami-based ship brokerage firm, brokered these charters.
Throughout this time, the vessel was regularly maintained, supplied and crewed in Florida, with repairs and periodic dry-dockings carried out at commercial facilities located either in Jacksonville, Miami, or Port Everglades. The offices of Bureau Veritas at Miami and Port Everglades carried out all classification surveys. Florida-based ship chandlers always provisioned the vessel in Florida ports (Miami, Jacksonville, Port Everglades). New and relieving crew members always boarded the vessel in Florida ports, and their contracts of employment were always signed upon their reporting on board.
Prior to the February 1996 casualty, the only litigation involving the ANTHENOR EXPRESS during this eight-year period was an action brought in the United States District Court, Tampa, Florida, in or about 1992, involving Tampa Bay Shipping of Florida and Apollo Stevedore Shipping, Inc. The Tampa office of Holland & Knight represented Glovegold in this earlier matter.

*8 B. THE INSURANCE POLICY
On July 31, 1995, TSC issued Glovegold a policy of hull and machinery (H & M) insurance for the period from July 31, 1995, to December 31, 1995. Lars Rhodin, the Director of the Hull Claims Department for TSC, stated by affidavit, "[t]here was no connection with the State of Florida or the United States of America in the placing or issuing of the insurance." The affidavit of George Zachariou, master of the ANTHENOR EXPRESS until July 31, 1995, however, affirmed that the vessel was berthed at Port Everglades, Florida on July 31, 1995, when the policy was issued. According to Glovegold, TSC, by addendum executed December 31, 1995, extended the coverage to December 31, 1996. Glovegold also submitted the affidavit of Konstantinos S. Kostopoulos, Glovegold's managing director. Kostopoulos explained the hand-written notes of Mr. Pokidis, a major Glovegold shareholder. These notes, a copy of which was attached to the Kostopoulos affidavits, reflected the deck log entries of the ANTHENOR EXPRESS, and they showed that the ANTHENOR EXPRESS was berthed in the Port of Miami on December 31, 1995, when the addendum was executed.

C. THE CLAIM
As mentioned at the outset, on February 5, 1996, while sailing in Florida waters en route to Jacksonville, the ANTHENOR EXPRESS, then about six miles south of the Jacksonville sea buoy, experienced catastrophic damage to the crankshaft of her main engine and extensive consequential damage. The failure left the vessel unable to proceed on her own power, necessitating her being towed by a Florida-based tug to North Florida Shipyards in Jacksonville. Glovegold alleges that its resulting loss was attributable to a peril insured by TSC's H & M insurance policy.
Glovegold notified TSC who directed SMCO to investigate. Based on the results of the SMCO investigation, TSC refused to cover the damage sustained by the ANTHENOR EXPRESS. The vessel remained in Jacksonville disabled and unable to sail. In October 1996, the Jacksonville shipyard and the towing company, along with various other creditors, caused the vessel to be arrested pursuant to an in rem proceeding in federal district court. See North Fla. Shipyards v. Glovegold Shipping, 96-105-Civ-J-10 (M.D.Fla. 1997). On September 23, 1997, the federal court ordered a judicial sale of the ANTHENOR EXPRESS.
Glovegold then sued TSC in the Circuit Court for Duval County, alleging breach of insurance obligations. TSC moved to dismiss the action for, among other things, lack of personal jurisdiction and improper venue. TSC filed one affidavit, that of Lars Rhodin, in support of its motion. As previously discussed, the affidavit of Lars Rhodin states that there was no connection between Florida and the policy of H & M insurance issued to appellant. The affidavit also set out TSC's view of its (limited) contacts with Florida:
8. The Swedish Club is neither incorporated in nor authorized to transact business in Florida; has no agents, employees, agency or offices in Florida; and does not in any manner transact, operate, conduct, engage in or carry on business or any business venture in Florida. Furthermore, The Swedish Club does not sell, consign or lease by any means whatsoever tangible or intangible personal property, through brokers, jobbers, wholesalers or distributers, to any person, firm or corporation in Florida. Since 1991, three or four of our members have utilized the services of Coastal States Insurance Brokers, a broker in Panama City, Florida, to place *9 insurance for various members in The Swedish Club. None of those members was a Florida based ship owning company or operator, but were located in Panama, Texas, Connecticut, Singapore, Liberia, Denmark, Norway, Isle of Man and The Bahamas. One member, based in The Bahamas with ships registered in Panama and The Bahamas, placed its insurance through another Florida based broker, Sedgwick Bergvall in Miami, since 1992 which was continued through 1996. In 1996, the time of the incident alleged, these were the only connections The Swedish Club had with Florida. Approximately twice each year a Goteborg-based underwriter for The Swedish Club visits the above brokers, but in 1996 and since that time there has been no procurement of insurance business covering owners, operators or vessels operating out of or located in Florida.
TSC also sought a protective order barring discovery until the trial court ruled on the motion to dismiss. The trial court granted the motion to dismiss, finding that TSC had not subjected itself to personal jurisdiction in Florida.
TSC further asserted that venue in the Florida courts would be improper due to the presence of a forum selection clause in the insurance contract. The insurance policy documents in the record state, "[t]his insurance is subject to Institute Time ClausesHulls 1/10/83, current circulars, The Articles of Association and Swedish Law." TSC asserts that the applicable "Swedish Law" is the Swedish Maritime Code, which refers any dispute involving maritime insurance to the Swedish average adjuster, whom they characterize as a semi-judge, for the purpose of resolving marine insurance disputes. The trial court accepted this interpretation of the contract and ruled that venue would lie exclusively in Goteborg, Sweden, before the Swedish average adjuster.

II. PERSONAL JURISDICTION

A. LONG ARM STATUTE
As a prerequisite for jurisdiction over a foreign defendant, the plaintiff must identify a provision in the forum state's long-arm statute providing a basis for such jurisdiction. If the defendant's conduct brings it within the scope of the long-arm statute, the court must then perform a constitutional analysis to determine whether exercising jurisdiction over the defendant would offend the requirements of due process. See International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); see also Price v. Point Marine, Inc., 610 So.2d 1339, 1341 (Fla. 1st DCA 1992) (holding that in an analysis of personal jurisdiction, a court must apply the tests of constitutional due process after deciding that a defendant falls under the state's long-arm statute).
Florida's long-arm statute provides:
(1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
. . .
(d) Contracting to insure any person, property, or risk located within this state at the time of contracting.
§ 48.193(1)(d), Fla. Stat. (1999). We must first determine, then, whether the facts of this case bring TSC under our long-arm statute. Glovegold asserts that the ANTHENOR EXPRESS was located in *10 Florida at the time TSC issued the contract of H & M insurance.
Florida law prescribes a certain procedure when a motion to dismiss raises the issue of personal jurisdiction. See Venetian Salami v. Parthenais, 554 So.2d 499, 502 (Fla.1989). First, the plaintiff pleads the basis for jurisdiction without the necessity of including all supporting facts. See id. A foreign defendant that wishes to contest jurisdiction must move to dismiss and, further, must attach to the motion affidavits in support of this position. See id. The burden then shifts to the plaintiff to prove by affidavit that jurisdiction is proper. See id. Where the affidavits can be harmonized, the trial court can make a decision based upon facts that are essentially undisputed. See id. at 502-03. If the affidavits are in direct conflict and cannot be reconciled, then the trial court must hold a limited evidentiary hearing to determine jurisdiction. See id. at 503.
In this case, the parties correctly followed this procedure. Glovegold filed its complaint, followed by TSC's motion to dismiss with the Rhodin affidavit. The Rhodin affidavit contains a conclusory statement that there was no connection to Florida in the issuing of the H & M insurance. Glovegold then submitted detailed affidavits to rebut the Rhodin statement. The trial court, however, expressed doubt that the vessel was in Florida when TSC entered the contract of insurance. The trial court stated:
Plaintiff has filed an affidavit from one of the managing directors of Glovegold Shipping Ltd. in which he says that the vessel may well have been in Florida at the time the contract of insurance was entered into, although the affidavit describes a scheduled visit and not a specific time that the vessel was in Florida. The affidavit does not show where the vessel was at the time the risk actually commenced.
If the trial court was unsure, after reviewing the affidavits, it was obligated to undertake a limited evidentiary hearing on that issue. See Venetian Salami, 554 So.2d at 503. Based on the judge's language, however, it appears that he actually misread or overlooked the affidavits introduced by Glovegold. The Zachariou affidavit states that the ANTHENOR EXPRESS was in Port Everglades on July 31, 1995, when the contract for insurance was initially executed. Furthermore, the Kostopoulos affidavit states that the ANTHENOR EXPRESS was in the port of Miami on December 31, 1995, when the insurance coverage was extended. TSC's general allegation of "no connection" does not sufficiently counter Glovegold's relatively specific demonstration of such a connection. We simply cannot know what factors Rhodin included in his evaluation, with regard to this particular insurance undertaking. The affidavits are not, therefore, in "direct conflict." Glovegold sufficiently demonstrated a statutory basis for jurisdiction, and the trial court erred by not finding as much.
Nevertheless, Florida's long-arm statute will apply in this case only if the cause of action arises from one of the contacts enumerated in section 48.193(1), Florida Statutes (1999), here, the contract to insure the ANTHENOR EXPRESS while she was located in a Florida port. Satisfaction of this arising from requirement necessitates a "`direct affiliation,' `nexus,' or `substantial connection' ... between the basis for the cause of action and the [action that falls under the long-arm statute]." Citicorp Ins. Brokers v. Charman, 635 So.2d 79, 82 (Fla. 1st DCA 1994) (quoting Damoth v. Reinitz, 485 So.2d 881, 883 (Fla. 2d DCA 1986)). Glovegold's cause of action sets out TSC's denial of a *11 claim under the insurance contract at issue. Therefore, a direct affiliation between TSC's Florida-related act and Glovegold's cause of action exists. Consequently, Florida's long arm statute gives the Florida courts jurisdiction over TSC subject to any constitutional due process limitations.

B. DUE PROCESS
We must now determine whether exercise of personal jurisdiction offends the due process clause of the federal Fourteenth Amendment. See International Shoe, 326 U.S. at 316, 66 S.Ct. 154. The law recognizes two types of personal jurisdiction, specific and general jurisdiction. See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n. 8 & 415 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Specific jurisdiction exists "when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." Id. at 414 n. 8, 104 S.Ct. 1868. General jurisdiction exists "[w]hen a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum...." Id. at 415 n. 9, 104 S.Ct. 1868. This distinction is important in determining the applicable constitutional due process test.
To exercise specific personal jurisdiction over a defendant, a court must find that "the nonresident ... defendant... has `certain minimum contacts with [the forum] such that maintenance of the suit does not offend `traditional notions of fair play and substantial justice.''" Id. at 414, 104 S.Ct. 1868 (quoting International Shoe, 326 U.S. at 316, 66 S.Ct. 154). The standard for an exercise of general personal jurisdiction is a much higher standard. The court must find that the defendant's contacts with the forum represent continuous and systematic general business contacts. See id. at 416, 66 S.Ct. 154. Here, Glovegold relies upon specific personal jurisdiction, because its claim arises out of TSC's contract to insure the ANTHENOR EXPRESS, which was located in Florida at the time of the contract's execution. We have already noted that TSC's issuance of the H & M policy satisfies Florida's long-arm statute in this case. Accordingly, due process will not require a finding of continuous and systematic general business contacts.
Nevertheless, a Florida court may exercise jurisdiction over TSC only if Glovegold can demonstrate that TSC has minimum contacts with Florida such that requiring TSC to defend a Florida suit would not offend traditional notions of fair play and substantial justice. See International Shoe, 326 U.S. at 316, 66 S.Ct. 154; see also Venetian Salami, 554 So.2d at 502 ("[E]ven though a nonresident may appear to fall within the wording of a long arm statute, a plaintiff may not constitutionally apply the statute to obtain jurisdiction in the absence of the requisite minimum contacts with the forum state."). A court will find constitutionally adequate minimum contacts where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (citing Kulko v. California Superior Court, 436 U.S. 84, 97-98, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978)). The United States Supreme Court has held that mere foreseeability is not the benchmark for personal jurisdiction. See id. at 295, 100 S.Ct. 559. For instance, it is not enough to find a likelihood that a TSC insured vessel might find its way to Florida. See id. at 297, 100 S.Ct. 559. Instead, due process looks for a relationship between *12 the defendant, defendant's conduct and the litigation in the forum. See Helicopteros, 466 U.S. at 414, 104 S.Ct. 1868 (quoting Shaffer v. Heitner, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)). The focus of this standard is fairness. See Woodson, 444 U.S. at 292, 100 S.Ct. 559.
TSC argues that it holds no authorization to transact business in Florida and, in fact, transacts no business in Florida; maintains no offices or agents in Florida; and sells no insurance in Florida. This argument does not, however, determine the issue before us. We must examine all factors bearing upon the minimum contacts question. Accordingly, we note the following matters supported by the record: TSC entered into an insurance contract for a vessel primarily trading in and out of Florida; the vessel was in Florida at the time of the contract; the vessel was in Florida at the time of extension of the contract; the vessel was involved in previous litigation in Florida; TSC has a network of correspondents in the state; TSC utilized Florida insurance brokers; a Goteborg-based underwriter for TSC consistently visited Florida brokers for at least five years, including the time period when TSC insured the ANTHENOR EXPRESS; and, the mechanical problem that disabled a ship that frequented Florida ports in fact occurred in Florida waters, requiring the assistance of a Florida towing company and shipyard. These are the factors we apply to our analysis.
In an instructive case, the federal Court of Appeals for the First Circuit looked at similar factors and upheld Puerto Rico's jurisdiction over the foreign insurer of a vessel that ran aground off the Puerto Rican coast and caused an oil spill. See Commonwealth of Puerto Rico v. SS Zoe Colocotroni, 628 F.2d 652 (1st Cir.1980). The insurer in Colocotroni argued that it had no offices in Puerto Rico, sold no insurance there, and transacted no business there. See id. at 667. The Colocotroni court did not use the "arising out of" language developed by later cases. See, e.g., Helicopteros, 466 U.S. at 414, 104 S.Ct. 1868 (defining specific personal jurisdiction as "jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum...."). The court, however, relied upon Puerto Rico's long-arm statute, which provides for jurisdiction over a nonresident "if the action or claim arises as a result of carrying out business transactions within Puerto Rico. Colocotroni 628 F.2d at 668. The Colocotroni court's analysis assists our consideration of this case.
TSC urges us to find that Colocotroni has no persuasive force because it conflicts with Woodson. The Colocotroni court did not, however, rely solely upon the foreseeability standard condemned by Woodson; rather, the court found minimum contacts between the defendant insurer and Puerto Rico sufficient to warrant personal jurisdiction over the insurer. First, the insurer regularly issued insurance to vessels that frequented Puerto Rico and operated within Puerto Rican waters. See Colocotroni, 628 F.2d at 668. Second, the insurer had a system of Puerto Rican correspondents available to aid the owners of any vessel that might need legal representation within Puerto Rico. See id. Third, even though the insurer did not make any effort to insure vessels in Puerto Rican waters, it advertised the names of their Puerto Rican correspondents, affirmatively encouraging commerce within Puerto Rican waters. See id. at 669. Finally, the Colocotroni court recognized that an insurer has some control over its insureds to influence the course taken by insured vessels. See id. at 670. For instance, the insurer can limit coverage to specific jurisdictions, and if it chooses not to do so, it can reasonably *13 expect to be haled into court in many jurisdictions. See id.
In Colocotroni, the insurer's contacts with Puerto Rico satisfied both the long-arm statute and constitutional tests for specific jurisdiction. See id. The court reasoned that "by advertising the name of its local correspondent in San Juan, [the insurer] affirmatively encouraged such commerce [in Puerto Rico]." Id. at 669. The court then concluded that "where it not only does not act to curtail such presence [in Puerto Rico] but actively promotes it by providing contractual services in the jurisdiction, we hold that such an insurer is amenable to personal jurisdiction in the forum." Id. The same reasoning applies in the present case.
TSC is an international company, insuring risks around the world through a complex scheme of brokers and underwriters. TSC's own marketing materials, including those available on the world wide web, advertise a network of correspondents who can handle claims quickly. These materials specifically mention correspondents in three Florida cities. These facts are similar to those upon which the Colocotroni court focused when determining that the defendant insurer was subject to personal jurisdiction.
TSC characterizes Colocotroni as in conflict with the United States Supreme Court's decision in Woodson, and further suggests that Helicopteros rendered Colocotroni moot. We are not so persuaded. Colocotroni was decided after Woodson, and as noted above, the Colocotroni court distinguished its holding from Woodson, by noting the regularity of contacts and control over the insured vessel's course. See Colocotroni, 628 F.2d at 668-70. In Helicopteros, the parties conceded that the claims "did not `arise out of,' and were not related to, [the defendant's] activities within Texas." Helicopteros, 466 U.S. at 415, 104 S.Ct. 1868. Helicopteros thus focused upon whether the forum had general jurisdiction over the defendant. See id. Helicopteros does not delegitimize our analysis of specific personal jurisdiction.
TSC also invites us to construe two decisions of this court as supporting dismissal. See Ocean Chem. Transp., Inc. v. Cotton, 702 So.2d 1272 (Fla. 1st DCA 1997) (finding port stops at the direction of the ship's charterer, engaging husbanding agents, soliciting Florida employees, and maintenance of an escrow account to ship pollutants into the jurisdiction do not satisfy the requirements for specific personal jurisdiction); American Overseas Marine Corp. v. Patterson, 632 So.2d 1124 (Fla. 1st DCA 1994) (finding "sporadic and nonpurposeful utilization of certain Florida ports" insufficient to exercise general jurisdiction over nonresident shipowner). These cases are not factually analogous to the present case, and they do not control our analysis.
In Cotton, the court stated:
Appellant's activities do not satisfy the "connexity" or "causal connection" requirement of specific personal jurisdiction because Appellee's suit does not arise out of or relate to Appellant's contacts with Florida.
702 So.2d at 1272-73. Although the court noted that the defendant's contacts with the forum did not meet the standard for specific jurisdiction, the quoted language suggests that the court analyzed general jurisdiction. Such must be the case because the suit did not arise out of or relate to the defendant's contacts with Florida. See id. The court couched the analysis in terms of specific jurisdiction only because the trial court had ruled that it had specific personal jurisdiction over appellants. See id. at 1272. The trial court could not have specific jurisdiction because the claim did not arise out of the defendant's contacts with Florida. This court also implicitly *14 recognized that defendant's contacts with Florida were insufficient to overcome the much higher hurdle imposed by the due process standard for finding general jurisdiction.
Patterson similarly did not pass on a question of specific jurisdiction. The plaintiff there was a crew member injured while the vessel on which she worked was in the harbor of Saipan. See Patterson, 632 So.2d at 1125. The vessel had no contact with Florida for two and one-half years before the accident. See id. at 1127. We explained that Florida courts could not exercise specific jurisdiction because there was no causal connection between the defendant's activities in the state and plaintiff's cause of action. See id. Absent a causal connection, "a court in the forum state may exercise jurisdiction over a nonresident defendant only where general jurisdiction can be established." Id. (citing Helicopteros, 466 U.S. at 411-12, 104 S.Ct. 1868). The court then went on to analyze whether the defendant's activities met the higher threshold of general jurisdiction. See id.
Neither Cotton nor Patterson dictate that the Florida courts cannot exercise specific jurisdiction over TSC in this case. Under Florida's long-arm statute, Glovegold's cause of action does arise out of TSC's contact with Florida, and Glovegold need only demonstrate the constitutionally adequate minimum contacts. We hold that TSC's purposeful connections to Florida satisfy the minimum contacts test.

III. VENUE
The trial court read the language in the H & M insurance policy as a forum selection clause. This was error. Florida procedural rules govern a determination of the validity of a forum selection clause. See Fendi v. Condotti Shops, Inc., 754 So.2d 755, 758-59 (Fla. 3d DCA 2000) (citing Manrique v. Fabbri, 493 So.2d 437 (Fla.1986), which applied the law of the forum, instead of the law selected by the parties, in determining the validity of a forum selection clause). The clause in the contract between Glovegold and TSC provides: "This insurance is subject to Institute Time ClausesHulls 1/10/83, current circulars, The Articles of Association and Swedish Law." This language may be a choice of law provision, but as this question has not been litigated, we express no opinion in that regard. Even if this language constitutes a choice of law provision, however, it does not mandate a specific venue. See Intercapital Funding Corp. v. Gisclair, 683 So.2d 530, 532 (Fla. 4th DCA 1996) (holding that a provision that states "This Purchase and Sale Agreement has been made and is performable in West Palm Beach, Palm Beach County, Florida, and shall be governed by the Laws of the State of Florida" was not a forum selection provision because it was titled "Governing Law" and did not contain the word "forum" or "venue"); see also Management Computer Controls, Inc. v. Charles Perry Constr., Inc., 743 So.2d 627, 631 (Fla. 1st DCA 1999) (stating that for a forum selection clause to be mandatory, it must use mandatory language such as "any litigation must be initiated in a specified forum"). Accordingly, we hold that the contract for H & M insurance does not contain a valid forum selection clause, and venue in Jacksonville is proper.
Based on the foregoing, we REVERSE the order dismissing appellant's claim for lack of jurisdiction and venue, and REMAND for further proceedings.
WOLF and LAWRENCE, JJ., concur.